UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                      )
ROGER G. CHARLES,                     )
                                      )
                 Plaintiff,           )    Civ. No. 09-0199 (KBJ)
                                      )
        v.                            )
                                      )
OFFICE OF THE ARMED FORCES MEDICAL    )
EXAMINER, ARMED FORCES INSTITUTE OF   )
PATHOLOGY, AND THE UNITED STATES      )
DEPARTMENT OF DEFENSE,                )
                                      )
                 Defendants.          )
_____)

# **MEMORANDUM OPINION**

This Freedom of Information Act ("FOIA") matter is now more than four years old. It began when Plaintiff Roger Charles ("Charles" or "Plaintiff"), a journalist and former Marine Corps officer, undertook to research the effectiveness of the body armor that the Department of Defense ("DOD") issues to military personnel in combat zones. *See Charles v. Office of the Armed Forces Med. Exam'r* ("*Charles II*"), No. 09-199, 2013 WL 1224890, at *1 (D.D.C. Mar. 27, 2013).[1] Charles submitted a FOIA request to the Armed Forces Institute of Pathology ("AFIP") seeking certain autopsy and medical records for soldiers killed in combat. When the agency failed to respond, Charles filed the instant FOIA lawsuit against the AFIP, the DOD, and the Office of the Armed Forces Medical Examiner ("OAFME"). [ECF No. 1.] Over the next three years, Defendants claimed to be exempt from having to produce documents and materials in

---

[1] Charles is the editor of the online publication *Defense Watch*. *Charles II*, 2013 WL 1224890, at *1.

1

response to Charles's FOIA inquiry for various reasons, and two different federal judges reviewed and ruled upon aspects of Defendants' exemption arguments in relation to cross-motions for summary judgment that the parties filed regarding the FOIA claim. *See Charles II*, 2013 WL 1224890 (Roberts, J.); *Charles v. Office of Armed Forces Med. Exam'r* ("*Charles I*"), 730 F. Supp. 2d 205 (D.D.C. 2010) (Urbina, J.). Consequently, by 2013, only one narrow issue remained in this case: whether Defendants, who had invoked FOIA Exemption 5 to withhold redacted "preliminary" autopsy reports in their entirety, have adequately established that the factual information that such records contain is not reasonably segregable from the exempted material.

For the reasons that follow, and after consideration of the prior rulings and the entire record in this matter, this Court concludes that Defendants have sufficiently demonstrated that the factual material contained in the preliminary autopsy reports is not reasonably segregable and that, therefore, Defendants are entitled to withhold these reports in their entirety pursuant to FOIA Exemption 5. Accordingly, the Court construes Defendants' most recent filing regarding segregability [ECF No. 59] as a renewed motion for summary judgment with respect to the Exemption 5 issue, and so construed, **GRANTS** Defendants' summary judgment motion as it relates to the preliminary autopsy reports. A separate order that permits Defendants to withhold the preliminary autopsy reports in their entirety under FOIA Exemption 5 accompanies this memorandum opinion.

I.  BACKGROUND

In October of 2008, Charles requested that the AFIP produce a certain set of pathology records for deceased military personnel pursuant to the FOIA; specifically, documents that

> [1] analyze fatal wounds from bullets that were inflicted on military service members wearing body armor in Iraq and Afghanistan between January 1, 2006, and December 31, 2007, and [2] analyze the relationship between personal body armor and lethal torso injuries sustained by such service members.

*Charles II*, 2013 WL 1224890, at *1 (record citation and internal quotation marks omitted). The AFIP did not respond to Charles's FOIA request; instead, that agency forwarded the request to the OAFME. *Id.* Charles initiated this lawsuit in February of 2009, after "the AFIP had neither produced any documents nor provided any estimate of when it might respond." *Id.* (citation omitted).

In April of 2009, following discussions between counsel for both parties, Captain Craig T. Mallak, who was the Armed Forces Medical Examiner for the DOD at that time, convened a meeting "to determine whether the AFIP or the [Armed Forces Medical Examiner System ("AFMES")] possessed any documents responsive to [Charles's] inquiry." *Charles I*, 730 F. Supp. 2d at 209. After this meeting, the Department of Defense identified 103 autopsy files and 18 body armor description sheets that were responsive to Plaintiff's FOIA request. *Charles II*, 2013 WL 1224890, at *2. The autopsy files contained "information such as preliminary and final autopsy reports, autopsy photographs, body diagrams, CT scans, medical records and death certificates." *Charles I*, 730 F. Supp. 2d at 210. The body armor description sheets contained "written descriptions of wounds and wound patterns and notations of possible

3

links between injuries sustained while wearing personal protective equipment and resulting wound patterns." *Id.* (record citation and quotation marks omitted). Nevertheless, "[a]lthough the defendants identified the records as responsive to Charles's request, they decided to withhold all of the records in their entirety under FOIA exemptions." *Charles II*, 2013 WL 1224890, at *2 (record citation omitted).

In October of 2009, Defendants moved for summary judgment, arguing that the search for records responsive to Mr. Charles's FOIA request was adequate and that the records had been properly withheld. *Id.* at *2. Charles cross-moved for summary judgment, and he also narrowed his FOIA request. *Id.* Rather than continuing to seek documents analyzing "fatal wounds" that "service members wearing body armor" had sustained, for example, Charles sought a narrower subset of documents, including:

> (a) [Armed Forces Medical Examiner Tracking System] body armor descriptions sheets, related to body armor worn by a soldier killed in Iraq or Afghanistan between January 1, 2006 and December 31, 2007, which indicate that the body armor was not intact upon receipt for inventory, and
>
> (b) autopsy reports and associated documents:
>
> > (1) indicating that a soldier killed in Iraq or Afghanistan between January 1, 2006 and December 31, 2007 suffered a fatal gunshot wound in an area likely covered by the front or rear ceramic insert plates of that soldier's body armor, and/or
> >
> > (2) commenting, discussing or indicating that the body armor worn by a soldier killed in Iraq or Afghanistan between January 1, 2006 and December 31, 2007 did not prevent a fatal wound, or was penetrated by a bullet.

4

*Charles I*, 730 F. Supp. 2d at 210 (record citation omitted).[2] Charles also limited his FOIA request to make clear that he was willing to accept copies of records with redacted personal identifying information. *Id.*[3]

Upon receiving Charles's revised FOIA request, Defendants determined that none of the records that Defendants previously had identified in response to Charles's initial FOIA request were responsive to Plaintiff's revised FOIA request. *Id.* at 210-11. In reply, Charles "protested the defendants' apparent reversal on the question of whether they possess any responsive documents." *Id.* at 211. The Court granted in part Charles's cross-motion for summary judgment on the grounds that Defendants' unfruitful search for responsive records was "unreasonable" and "inadequate," *id.* at 213, and ordered the parties to produce additional submissions on the potential applicability of any FOIA exemptions in light of Charles's narrowed request. *Id.* at 213, 217.

Thereafter, Defendants determined that they possessed material responsive to Charles's revised FOIA request. *Charles II*, 2013 WL 1224890, at *3 (noting that,

---

[2] This quoted text first appeared in Charles's opposition to Defendant's first motion for summary judgment (*see* Pl.'s Cross–Mot., ECF No. 20, at 9) and does not reflect the precise language of Charles's revised FOIA request (*see id.*, Ex. 12, "Letter Dated November 9, 2009," ECF No. 20-15 (notifying the agency of Charles's narrowed FOIA inquiry)). However, the parties have referred to Charles's revised FOIA request using the above-quoted language throughout this litigation, and the Court noted previously in the course of this action that any differences between the quoted language and Charles's actual request are immaterial. *See Charles I*, 730 F. Supp. 2d at 211 n.1.

[3] Charles's revised request specifically accepted the following redactions:

> all personal identifying information, information regarding dates of attack and unit numbers, the location of any wounds or wound patterns, the location of any damage to body armor, the entry, exit point or trajectory of bullets, the identification of any need to improve a *specific* aspect of body armor worn by military service personnel or the disclosure of information that will identify *specific* locations of vulnerability in the [IBA] system or that indicate or suggest *specific* improvements to body armor.

*Charles II*, 2013 WL 1224890, at *2, n.3 (emphasis in original). Any reference to responsive materials in this opinion is meant to refer to the materials in this redacted form.

5

among the responsive materials in Defendants' possession, were "82 autopsy reports and associated documents and 7 body armor description sheets"). However, Defendants filed a second motion for summary judgment in October of 2010, asserting that all of the responsive records were being properly withheld pursuant to FOIA Exemptions 2, 5, and 6. *Charles II*, 2013 WL 1224890, at *2.[4] Charles again cross-moved for summary judgment, *id.*, but the Court denied both parties' summary judgment motions without prejudice due to a change in the controlling law. (Minute Orders of Sept. 1, 2011.)[5]

In October of 2011, Defendants filed a third motion for summary judgment. (Defs.' Third Mot. for Summ. J., ECF No. 41, at 1.) In this motion, Defendants no longer relied on Exemption 2, and instead argued that the responsive documents they possessed—*i.e.*, 82 final autopsy reports, 42 preliminary autopsy reports, CT scans, body diagrams, and in-theater medical records—were being properly withheld pursuant to FOIA Exemptions 5 and 6. *Charles II*, 2013 WL 1224890, at *3. During subsequent negotiations, Charles relinquished his request for CT scans, body diagrams, and body armor description sheets, so that the litigation ultimately concerned only the redacted preliminary and final autopsy reports and in-theater medical records.[6] Even so,

---

[4] FOIA Exemption 2 permits a governmental agency to withhold records responsive to a FOIA request where the records "relate[] solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). FOIA Exemption 5, which is often referred to as the "deliberative process privilege" under the circumstances presented here, permits a governmental agency to withhold records responsive to a FOIA request where the records include "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *Id.* § 552 (b)(5). And FOIA Exemption 6 permits a governmental agency to withhold records responsive to a FOIA request where the records include "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 552 (b)(6).

[5] In March 2011, the Supreme Court issued its opinion in *Milner v. Dep't of Navy*, which clarified the scope of FOIA Exemption 2. 131 S. Ct. 1259, 179 L. Ed. 2d 268 (2011).

[6] Charles no longer sought "the CT scans and body diagrams because he agree[d] that they contain only information that . . . could be redacted from the records." *Charles II,* 2013 WL 1224890, at *3 n.5. Additionally, the parties notified the Court on December 19, 2011, that they had "resolved any dispute

6

Defendants maintained that all such records were properly withheld because the redacted final autopsy reports and in-theater medical records were exempt under FOIA Exemption 6 and the redacted preliminary autopsy reports were exempt under FOIA Exemption 5. *Id.* at *4, *7. Charles cross-moved for summary judgment, arguing that these FOIA Exemptions do not apply. *Id.* at *3.

In an Opinion and Order issued March 27, 2013 ("*Charles II*"), the Court held that Defendants failed to invoke Exemption 6 properly regarding the 82 redacted final autopsy reports and in-theater medical records and ordered Defendants to produce copies of these records. *Id.* at *9 n.12. With respect to the additional set of 42 preliminary autopsy reports that were responsive to Plaintiff's request, however, the Court held that Defendants had properly invoked FOIA Exemption 5. *Id.* at *3 n.4. Specifically, the Court concluded that the preliminary autopsy reports meet Exemption 5's "predecisional" and "deliberative" requirements because the preliminary autopsy reports "are drafts of the final autopsy reports" that were "created before the final cause and manner of death [were] determined" and reflect the "tentative view of the meaning of evidence discovered during an autopsy." *Id.* at *5-6 (record citations omitted).

Having determined that Exemption 5 applies to the redacted preliminary autopsy reports, the Court next turned to the question of segregability. *Id.* at *6. Defendants argued that the factual parts of the preliminary autopsy reports are inextricably linked to the exempted material when the preliminary autopsy reports are compared with the final autopsy reports, and thus the preliminary autopsy reports can be withheld in their entirety under Exemption 5. (Defs.' Mem. in Supp. of Defs.' Third Mot. for Summ. J.,

---

regarding the body armor description sheets that are responsive to Plaintiff's narrowed . . . request." (Parties' Joint Notice, ECF No. 48, at 1.)

ECF No. 41-1, at 21-22 (stating that "factual information is often added, altered, or deleted from these records before the autopsy report is finalized, such that comparison of a preliminary autopsy report, body diagrams, and final autopsy report would reveal the agency's decisionmaking process.").) But when the Court reviewed what the Defendants had submitted on the issue of whether the factual content in the preliminary autopsy report was reasonably segregable from the exempted matter, it concluded that the Defendants had made "conclusory statement[s]" about the non-segregable nature of the preliminary autopsy reports in a manner that did not permit a reasoned segregability determination. *See Charles II*, 2013 WL 1224890, at *6 ("[D]efendants failed to provide a sufficiently detailed description of the information withheld, and a detailed justification correlating the claim that a comparison of the preliminary and final autopsy reports would disclose the agency's decisionmaking process with a description of the reports and the factual material they contain.").

Notably, the Court not only highlighted the deficiency of the Defendants' segregability showing, it also offered a solution: that "[D]efendants could have demonstrated that the factual information in the preliminary autopsy reports could be easily compared with the final reports to determine what information was originally contained in the reports and what information the agency ultimately concluded was correct." *Id.* But because Defendants had not yet made such a showing, the Court denied without prejudice Defendants' motion for summary judgment regarding the application of Exemption 5 to justify withholding the preliminary autopsy reports in their entirety and ordered Defendants to "file by April 29, 2013[,] a supplemental memorandum, with supporting affidavits, declarations, or a *Vaughn* index, that

8

demonstrates that the responsive preliminary autopsy reports were properly withheld in their entirety and that the defendants are not withholding nonexempt, reasonably segregable portions of the reports." *Id.* at *10 [hereinafter "the March 27th Order"].

On April 19, 2013, Defendants moved both to stay the Court's requirement that the 82 redacted final autopsy reports and in-theater medical records had to be produced, and to extend the deadline for "submit[ting] supplemental materials in support of their Exemption 5 withholdings." (Defs.' Mot., and Mem. in Supp., for a Stay Pending Appeal, and for an Extension of Time to Submit Supplemental Materials in Supp. of Exemption 5 Withholdings, ECF No. 50, at 1.) Charles objected to both requests, noting "that four years of litigation over [Plaintiff's] FOIA request is long enough[.]" (Pl.'s Opp'n to Defs.' Mot., and Mem. in Supp., for a Stay Pending Appeal, and for and Extension of Time to Submit Supplemental Materials in Supp. of Exemption 5 Withholdings, ECF No. 51, at 3.) This Court granted Defendants' motion to stay pending appeal the portion of the March 27th Order that required disclosure of the final autopsy reports and related records. (Mem. Opinion and Order of May 9, 2013, ECF No. 57, at 4.)[7] This Court also granted Defendants an extension of time, until May 24, 2013, to file supplemental materials in support of the Exemption 5 withholdings. (Minute Order of May 9, 2013.)

On May 24, 2013, Defendants submitted the following in response to the Court's order regarding the Exemption 5 issue: (1) a supplemental memorandum in support of their contention that the preliminary autopsy reports are non-segregable and thus can be

---

[7] As a condition of the stay, the Court ordered Defendants to "petition the Court of Appeals for expedited consideration of the appeal within ten days of filing a notice of appeal"; "produce all documents not subject to any appeal within thirty days of entry of final judgment"; and "notify the Court as soon as a decision regarding whether to file an appeal has been made." (*Id.*)

9

withheld in their entirety under FOIA Exemption 5 (*see* Defs.' Opening Supplemental Br. in Supp. of Withholding Prelim. Autopsy Reports in their Entirety Pursuant to FOIA Exemption 5, ECF No. 59 ("Defs.' Br.")); (2) the declaration of Colonel Ladd A. Tremaine, M.D., the DOD's current Armed Forces Medical Examiner (*see* Defs.' Br., Ex. 1, Decl. of Ladd A. Tremaine, ECF No. 59-1 ("Tremaine Decl.")); and (3) a chart that purports to compare the redacted preliminary and final autopsy reports (*see* Defs.' Br., Ex. 2, ECF No. 59-2 ("Chart")).[8] Plaintiff filed a response to the Defendants' supplemental submissions on June 7, 2013, and Defendants filed their reply submission on June 14, 2013. The outstanding question at present is a narrow one; specifically, whether Defendants have now sufficiently established the non-segregability of the redacted preliminary autopsy reports such that these materials can be withheld in their entirety under FOIA Exemption 5.

## II. DISCUSSION

Before this Court are the parties' supplemental submissions in support of, and in opposition to, a finding of non-segregability regarding the redacted preliminary autopsy reports for the purpose of Defendants' motion for summary judgment on the Exemption 5 issue. The Court adopts as law of the case the previous rulings that (a) Defendants failed to invoke FOIA Exemption 6 properly in regard to the final autopsy reports and therefore such reports must be produced, and (b) Defendants properly invoked

---

[8] Defendants submitted the chart presumably in lieu of a *Vaughn* index. The untitled document has four columns and appears to display, with respect to each paired grouping of preliminary and final autopsy reports: (1) a file number; (2) a Bates stamp number; (3) a "Description of Differences Between Redacted Preliminary and Final Autopsy Reports"; and (4) the "[Number] of Days Between Preparation of Preliminary and Final Autopsy Reports."

10

Exemption 5 in regard to preliminary autopsy reports.[9] As noted above, the only remaining summary judgment issue is whether Defendants have met their burden of demonstrating that they may withhold the preliminary autopsy reports in their entirety under FOIA Exemption 5 because there is no reasonably segregable material in the records at issue.

### A. Legal Landscape

#### 1. Segregability

The FOIA makes clear that the fact that a responsive document fits within an applicable exemption does not automatically entitle the keeper of such material to withhold the *entire* record. That is, even when an agency has properly invoked a FOIA exemption with respect to responsive material, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]" 5 U.S.C. § 552(b)(9); *see also Hamilton Sec. Grp. Inc. v. Dep't of Hous. & Urban Dev.*, 106 F. Supp. 2d 23, 33 (D.D.C. 2000) *aff'd pur curiam*, No. 00-5331, 2001 WL 238162 (D.C. Cir. Feb. 23, 2001) ("[P]urely factual material that is segregable from opinion material is generally not protected."). Thus, it is clear beyond cavil that factual portions of responsive records must be produced unless the factual parts "are inextricably intertwined with exempt portions." *Wilderness Soc'y v. U.S. Dep't of Interior,* 344 F. Supp. 2d 1, 18 (D.D.C.2004) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 260 (D.C. Cir. 1977)).

---

[9] *See Pepper v. United States*, 131 S. Ct. 1229, 1250-51, 179 L. Ed. 2d 196 (2011) (noting that the law of the case "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" unless "the court is convinced that its prior decision is clearly erroneous and would work a manifest injustice" (citations, alterations, and internal quotation marks omitted)).

If an agency seeks to withhold a responsive document in its entirety on the basis of a FOIA exemption, the agency bears the burden of demonstrating that the non-exempt portions of the document are so inextricable from the exempt portions that document is not reasonable segregable. *See Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993). To meet its burden in this regard, the agency must "provide[] a detailed justification and not just conclusory statements." *Valfells v. CIA,* 717 F. Supp. 2d 110, 120 (D.D.C. 2010) (citation and internal quotation marks omitted); *see also Wilderness Soc'y*, 344 F. Supp. 2d at 19 (noting that it is not sufficient for the agency merely to present "a blanket declaration that all facts are so intertwined" as to not be reasonably segregable). Furthermore, in order to approve the application of a FOIA exemption, the Court "must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (citations omitted).

2. Draft Records and the Segregability Standard

The D.C. Circuit has evaluated the segregability of requested records for FOIA purposes when the request involves drafts of released final documents. In *Russell v. Department of the Air Force*, 682 F.2d 1045 (D.C. Cir. 1982), the D.C. Circuit addressed a FOIA request for a preliminary draft of an official Air Force manuscript regarding the use of Agent Orange and other herbicides during the Vietnam War. After noting that the Air Force had already disclosed the final manuscript and that appellant's apparent motivation for seeking the draft was "to probe behind the official Air Force history," the *Russell* Court found that the preliminary draft was properly withheld under the deliberative privilege provisions of FOIA Exemption 5. *Id.* at 1047. Without

12

explicitly referencing "segregability," the Court explained that the requested portions of the preliminary draft could be entirely withheld largely because of the "complex system of editorial review" that gave rise to the final publication. *Id.* The agency's deliberative process would be implicated, the Court reasoned, because production of any portion of the draft would permit "a simple comparison between the [draft] and the official document," and such comparison "would reveal what material . . . senior officials judged appropriate for the history and what material they judged inappropriate." *Id.* at 1047-49; *cf. Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasizing that "[t]o the extent that predecisional materials, even if 'factual' in form, reflect an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter, they are protected under Exemption 5").

Applying the logic of *Russell*, judges in this circuit have found that similar draft documents do not contain reasonably segregable material, and thus are properly withheld in their entirety. *See, e.g., Carter, Fullerton & Hayes, LLC v. FTC*, 637 F. Supp. 2d 1, 6 (D.D.C. 2009) (finding that Defendant sufficiently justified withholding certain draft documents in their entirety); *Edmonds Inst. v. U.S. Dep't of Interior*, 460 F. Supp. 2d 63, 71 (D.D.C. 2006) (rejecting Plaintiff's argument that the responsive documents contained segregable factual information because the material at issue contained information that was "considered for but not utilized in" subsequent agency reports). These courts have reasoned that, even though preliminary drafts may indeed contain "factual" information, the ultimate decision to include or exclude facts and information in the final product reflects the deliberations of agency decisionmakers,

13

which would be improperly exposed upon comparison of the preliminary and final versions. *See Edmonds*, 460 F. Supp.2d at 71 (concluding that, if "information that was considered for inclusion in the [final report] but ultimately did not make its way into" the final report was disclosed, the agency's "editorial judgment" would be revealed). Thus, it is well established that draft documents containing factual information can be considered non-segregable for FOIA purposes and can be "properly withheld in full" where "revelation of the facts themselves, or more specifically, what the [final] author decided and selected as pertinent facts or information, would expose the deliberative process." *Carter*, 637 F. Supp. 2d at 6 (record citation and quotation marks omitted).

### B. Analysis

Relying primarily on *Russell*, Defendants in the instant case maintain that they have met their non-segregability burden because "any information in the preliminary autopsy reports that could arguably be viewed as factual is nonetheless protected by the deliberative process privilege." (Defs.' Br. at 2.) This is because, in the Defendants' view, "when compared with information in the final autopsy reports," disclosure of the preliminary autopsy reports "would reveal the decisionmaking process of AFMES in conducting forensic pathology investigations and reaching final, official determinations as to cause and manner of death." (*Id.* at 7.)

As an initial matter, this Court agrees with Defendants that *Russell*'s reasoning appears fully applicable to the responsive records at issue. First, it is undisputed, and this Court has already found, that the AFMES's preliminary autopsy reports are drafts that eventually are transformed into final autopsy reports regarding deceased service members such as the ones that have already been ordered disclosed. *See Charles II*,

14

2013 WL 1224890 at *6. As Colonel Tremaine's declaration states, the preliminary autopsy report is "essentially the first rough draft" of the final autopsy report. (Tremaine Decl. ¶ 11.)

Moreover, much like the complex internal review process that generated the final manuscript in *Russell*, *see* 682 F.2d at 1047-48, Defendants' supplemental submissions demonstrate that the internal review process that gives rise to an AFMES final autopsy report has four complicated phases involving several reviewers. (*See* Tremaine Decl. ¶ 6 (explaining that the generation of a final autopsy report "is a detailed, peer-reviewed, and quality controlled process that takes place in four phases").) During the first phase, a single AFMES forensic pathologist "conducts a comprehensive forensic pathology investigation," and creates a record known as "the preliminary autopsy report," which "contains the examining physician's initial anatomical observations, including the overall condition of the remains; the presence of any previous medical interventions; the nature, severity, and location of lethal and non-lethal injuries; and a Preliminary Autopsy Diagnosis (PAD)." (*Id.*, ¶¶ 9, 11.) Then, during the next three phases of the process, the preliminary autopsy report is systematically reviewed by the initial pathologist and others—including the Deputy Armed Forces Medical Examiner or the Armed Forces Medical Examiner himself—and the report is repeatedly subjected to both augmentation and revision. (*Id.*, ¶¶ 13-14.) It is only after the completion of this multifaceted and multi-layered review process that the final autopsy report is officially adopted as AFMES's "authoritative record of the forensic pathology investigation," including the "final determination of the cause and manner of death." (*Id.*, ¶ 14.) Thus, Defendants' contention that preliminary autopsy reports reflect the incomplete findings

of single AFMES forensic pathologist at the outset of a staged autopsy review process is amply supported.

Additionally, to the extent that the lynchpin of the D.C. Circuit's decision in *Russell* was the fact that it was possible to *compare* the draft and final versions of the manuscript at issue, and thereby to ascertain the agency's deliberative process, 682 F.2d at 1049, so it is here. The Court has already concluded that the final autopsy reports in the instant case are not exempt from disclosure; therefore, if the preliminary autopsy reports are also produced, a realistic opportunity for comparison of the draft to the final exists. And Defendants' submissions clearly demonstrate that there is, in fact, a comparison to be made because the preliminary and final autopsy reports can differ significantly. For example, according to Defendants' chart, the following differences can be noted when comparing one redacted preliminary autopsy report to its final counterpart:

> Final and preliminary contain different descriptions of method(s) of identification
>
> Final contains sections describing identifying marks, medical intervention, postmortem decomposition, and evidence recovered during the autopsy; preliminary does not
>
> Final contains results of toxicology tests; preliminary indicates toxicology is pending
>
> Preliminary indicates remains were reassociated by DNA; final does not

(Chart, at 2 (discussing file no. 1)). The chart spells out these kinds of differences (to the extent possible) with respect to each of the numbered files containing bates-stamped autopsy report comparators. (*See generally id*.) Moreover, Defendants' chart also clearly demonstrates that, as it journeys from the preliminary phase to the final, an

AFMES autopsy report can be substantially *revised* regarding significant matters such as how a soldier's remains were initially identified; whether there was evidence of pre-existent disease; which medical interventions were thought to have been provided prior to death; and what circumstances were believed to have surrounded the service member's passing. (*See, e.g.*, *id.* at 2, 3, 4 (discussing file nos. 6, 7, 12, and 19).) Given these demonstrated differences between the preliminary and final autopsy reports, which Colonel Tremaine's declaration also emphasizes (*see* Tremaine Decl. ¶ 20), the Court is convinced that *Russell's* concern about improper revelation of an agency's deliberative process upon comparison of the draft and final documents is also present here. (*See* Tremaine Decl., ¶ 20 ("[L]ooking at the redacted preliminary and final autopsy reports together, and noting their differences, would enable one to glean some of the substance of AFMES's deliberations during the forensic pathology investigation, including its deliberations in reaching final findings and conclusions regarding cause and manner of death.").) Consequently, the Court concludes that the Defendants' argument that they have properly invoked FOIA Exemption 5 to withhold the preliminary autopsy reports in their entirety is well founded.

     Charles asserts that Defendants nevertheless have failed to meet their burden of establishing true non-segregability. He emphasizes that he seeks only "purely factual" information, not information regarding the agency's deliberative process, and that Defendants have admitted that the preliminary autopsy reports contain such facts. (Pl.'s Opp'n at 3 (noting that Colonel Tremaine admits in his Declaration that the redacted preliminary autopsy reports contain information such as "whether a projectile or bullet fragment was recovered from the body," and that this is the type of "purely factual"

17

information that Plaintiff seeks through his FOIA request).) Charles further asserts that even if the Court were to accept Defendants' arguments regarding the revealing nature of a comparison between the preliminary and final autopsy reports, Defendants' submissions are merely "conclusory" and "speculative" in this regard (Pl.'s Opp'n at 7-10), because "Defendants do not *demonstrate* what specific, factual information in the final autopsy report could be compared to what specific information in the preliminary autopsy reports to reveal Defendants' decision-making processes" (Pl.'s Opp'n at 2 (emphasis added)).

Plaintiff's arguments are not persuasive. Defendants' supplemental submissions leave no doubt that the preliminary autopsy reports are drafts of the final autopsy reports that the Court has already ordered produced. Moreover, by establishing that the facts and information in a preliminary AFMES autopsy report often differ from that of the final report, Defendants have shown that "factual information is often added, altered, or deleted from these records before the autopsy report is finalized, such that comparison of a preliminary autopsy report . . . and final autopsy report would reveal the agency's decisionmaking process," *Charles II*, 2013 WL 1224890, at *6 (record citation and internal quotation marks omitted), which is all that the Court's previous order required. Indeed, taken as a whole, Defendants' supplemental submissions successfully demonstrate *both* the role of the preliminary autopsy report as an early step in the internal process by which the agency ultimately generates a final autopsy report *and* the fact that the various differences between the preliminary and final reports at issue result from the agency's internal, deliberative decisionmaking. Under these circumstances, the Court concludes that a simple comparison would reveal the agency's

18

"editorial judgment," *Edmonds*, 460 F. Supp.2d at 71, and to require Defendants to say more—*e.g.,* to make them flesh out with specificity precisely *how* a comparison between the two records would evidence the agency's deliberations—risks revealing the very discretionary determinations that FOIA Exemption 5 entitles the agency to protect. Accordingly, the Court concludes that Defendants have satisfied their burden of demonstrating the non-segregability of the redacted preliminary autopsy reports for the purpose of FOIA Exemption 5.

Finally, although neither party has requested *in camera* review of the redacted preliminary autopsy reports, the Court notes that such review is frequently undertaken in FOIA cases in order to assess segregability. *See Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996) (describing the "broad discretion" of district court judges "in determining whether *in camera* review is appropriate"). This Court considered whether to order such review *sua sponte* in this case; however, it is the law of this circuit that such review is not appropriate where, as here, the agency has already met its non-segregability burden. *See Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011) ("When the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate." (internal quotation marks omitted) (quoting *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)). It is also clear to this Court that when an agency's non-segregability argument is based on a comparison of a disputed draft record to the final document as a whole, it is the agency's unseen editorial process, rather than any specific aspect of the draft document's content, that triggers the agency's entitlement to

withhold the draft document in its entirety pursuant to Exemption 5.  In such circumstances, *in camera* review is unlikely to be especially revealing.

## III.    CONCLUSION

For the reasons stated above, the Court finds that Defendants' submissions sufficiently demonstrate that the preliminary autopsy reports do not contain reasonably segregable non-exempt information, and the Court is therefore persuaded that the preliminary autopsy reports may be withheld in their entirety pursuant to FOIA Exemption 5.  An appropriate Order that **GRANTS** Defendants' renewed motion for summary judgment on Exemption 5 grounds accompanies this Memorandum Opinion.


DATE:  October 2, 2013

*Ketanji Brown Jackson*
Ketanji Brown Jackson
United States District Judge